## ORAL ARGUMENT NOT SCHEDULED

### No. 10-5227

IN THE

# United States Court of Appeals

### FOR THE DISTRICT OF COLUMBIA CIRCUIT

Robert Gordon,
*Plaintiff-Appellant,*

v.

Eric Holder, *et al.*,
*Defendants-Appellees.*

Appeal from the United States District Court

for the District of Columbia, No. 9:05-cv-29

## APPELLANT'S OPENING BRIEF

| | |
|---|---|
| Aaron M. Streett | R. Stan Mortenson |
| BAKER BOTTS L.L.P. | *Counsel of Record* |
| One Shell Plaza | Sara E. Kropf |
| 910 Louisiana Street | Richard P. Sobiecki |
| Houston, TX 77002-4995 | Vernon A.A. Cassin III |
| (713) 229-1855 | BAKER BOTTS L.L.P. |
| | 1299 Pennsylvania Ave., N.W. |
| | Washington, DC 20004 |
| | (202) 639-7700 |
| | |
| | *Counsel for Plaintiff-Appellant* |
| | *Robert Gordon* |

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    Parties and Amici

Plaintiff-Appellant:

Plaintiff Robert Gordon, a citizen of the Seneca Nation.

Defendant-Appellees:

Eric Holder, the Attorney General of the United States of America, in his official capacity.

The United States Department of Justice.

Kenneth Melson, the Acting Director of the Bureau of Alcohol, Firearms and Explosives, in his official capacity.

The Bureau of Alcohol, Firearms, and Explosives.

John "Jack" Potter, the Postmaster General of the United States, in his official capacity.

The United States Postal Service.

### B.    Rulings Under Review

Mr. Gordon appeals the unpublished order of Judge Henry H. Kennedy, Jr., denying Mr. Gordon's motion to enjoin enforcement of the Prevent All Cigarette Trafficking Act, Pub. L. No. 111-154 ("PACT Act").

## C.    Related Cases

This case has not previously been before this court.  A related case is currently pending in the United States Court of Appeals for the Second Circuit. *See Red Earth LLC, et al. v. United States, et al.*, Nos. 10-3165, 10-3191, 10-3213 (2d Cir.).   There, the plaintiffs, Red Earth LLC and the Seneca Free Trade Association, seek to enjoin enforcement of the PACT Act.   (Mr. Gordon is a member of the Seneca Free Trade Association.)  Several of the defendants in *Red Earth* are Defendants-Appellants in this case.

The district court in *Red Earth* granted the plaintiffs' motion for a preliminary injunction in part and denied the motion in part.  The *Red Earth* plaintiffs and defendants have both appealed the district court's order, and both sides have filed emergency motions in the Second Circuit:  the plaintiffs seek to enjoin enforcement of the certain sections of the PACT Act pending appeal, and the defendants seek to stay the district court's preliminary injunction order pending appeal.  As of the date of this filing, the Second Circuit has not ruled on either motion.

*/s/ R. Stan Mortenson*
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, DC  20004
(202) 639-7700
rstanmortenson@bakerbotts.com

Dated:  Aug. 20, 2010

# <u>TABLE OF CONTENTS</u>

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES .............i

TABLE OF CONTENTS..............................................................................i

GLOSSARY ...................................................................................... viii

JURISDICTIONAL STATEMENT .......................................................1

STATEMENT OF THE ISSUES ...........................................................2

STATEMENT OF THE CASE..............................................................3

STATEMENT OF FACTS ....................................................................6

I.      PREVENT ALL CIGARETTE TRAFFICKING ACT .................6

II.     FACTUAL BACKGROUND................................................7

III.    PROCEDURAL HISTORY................................................12

SUMMARY OF ARGUMENT ...........................................................14

STANDARD OF REVIEW .................................................................17

ARGUMENT .....................................................................................18

I.      THE DISTRICT COURT ABUSED ITS DISCRETION BY
        APPLYING THE INCORRECT LEGAL STANDARD .............20

II.     THE DISTRICT COURT ABUSED ITS DISCRETION IN
        DENYING THE MOTION FOR PRELIMINARY INJUNCTION ............27

        A.   Mr. Gordon Has Demonstrated A Substantial Likelihood Of
             Success On The Merits....................................................27

             1.   The PACT Act's Mailing Ban Violates the Protections of the Fifth
                  Amendment................................................................28

2.  The PACT Act violates due process by subjecting nonresidents to the taxing jurisdiction of state and local governments without regard to minimum contacts ..........................................38

3.  The PACT Act unconstitutionally commandeers states to implement a federal taxation scheme ...........................................43

B.  Enforcement Of The PACT Act Would Irreparably Harm Mr. Gordon ........................................................................................48

C.  Enjoining Enforcement Of The PACT Act Would Not Substantially Injure Other Parties........................................................50

D.  The Public Interest Supports Enjoining Enforcement Of The PACT Act ....................................................................................52

CONCLUSION.................................................................................53

CERTIFICATE OF COMPLIANCE....................................................55

CERTIFICATE OF SERVICE .............................................................56

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*,
495 F.3d 695 (D.C. Cir. 2007)..........................................................29

*Al-Fayed v. CIA*,
254 F.3d 300 (D.C. Cir. 2001)..........................................................20

*Apotex, Inc. v. Sebelius*,
2010 WL 1254563 (D.D.C. Apr. 2, 2010)..........................................21

*Appalachian Voices v. Chu*,
2010 WL 2902767 (D.D.C. July 26, 2010) .........................................21

*\*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)..........................................................................42

*Champion v. Ames*,
188 U.S. 321 (1903)..........................................................................31

*Citizens for Police Accountability Political Committee v. Browning*,
572 F.3d 1213 (11th Cir. 2009) ........................................................17

*City of Philadelphia v. New Jersey*,
437 U.S. 617 (1978)..........................................................................36

*Colvin v. Caruso*,
605 F.3d 282 (6th Cir. 2010) ............................................................17

*Consumer Mail Order Ass'n of Am. v. McGrath*,
94 F. Supp. 705 (D.D.C. 1950)..........................................................49

*\*Craigmiles v. Giles*,
312 F.3d 220 (6th Cir. 2002) ......................................................37, 38

*Currier v. Henderson*,
190 F. Supp. 2d 1221 (W.D. Wash. 2002) .........................................32

*Davis v. Pension Benefit Guaranty Corp.*,
  571 F.3d 1288 (D.C. Cir. 2009)............................................................17, 20, 51

*Ellipso, Inc. v. Mann*,
  480 F.3d 1153 (D.C. Cir. 2007)............................................................20

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
  459 U.S. 400 (1983)............................................................34, 36

*FCC v. Beach Commc'ns, Inc.*,
  508 U.S. 307 (1993)............................................................29

*Feinberg v. Federal Deposit Ins. Corp*,
  522 F.2d 1335 (D.C. Cir. 1975)............................................................28

*Fund for Animals v. Frizzell*,
  530 F.2d 982 (D.C. Cir. 1975)............................................................23, 24

*Giovani Carandola, Ltd. v. Bason*,
  303 F.3d 507 (4th Cir. 2002)............................................................53

*Gonzalez-Droz v. Gonzalez-Colon*,
  573 F.3d 75 (1st Cir. 2009)............................................................21

*Greene v. McElroy*,
  360 U.S. 474 (1959)............................................................28

*Heller v. Doe*,
  509 U.S. 312 (1993)............................................................33

*Holt Civic Club v. Tuscaloosa*,
  439 U.S. 60 (1978)............................................................33

*Jones v. Caruso*,
  569 F.3d 258 (6th Cir. 2009)............................................................21

*Kartseva v. Dep't of State*,
  37 F.3d 1524 (D.C. Cir. 1994)............................................................28

*Katz v. Georgetown Univ., et al.*,
  246 F.3d 685 (D.C. Cir. 2001)............................................................21

*Kelo v. City of New London*,
545 U.S. 469 (2005)..............................................................36, 38

*\*Levin v. Commerce Energy, Inc.*,
130 S. Ct. 2323 (2010)..........................................................46, 47

*Louisville Gas & Elec. Co. v. Coleman*,
277 U.S. 32 (1928)......................................................................31

*Manges v. Camp*,
474 F.2d 97 (5th Cir. 1974) .......................................................28

*Mathews v. Lucas*,
427 U. S. 495 (1976)...................................................................33

*MeadWestvaco Corp. ex rel. Mead Corp. v. Ill. Dept. of Revenue*,
553 U.S. 16 (2008).......................................................................41

*Mills v. District of Columbia*,
571 F.3d 1304 (D.C. Cir. 2009)..............................................20, 51

*\*National Bellas Hess, Inc. v. Department of Revenue of Illinois*,
386 U.S. 753 (1967).....................................................................43

*\*New York v. United States*,
505 U.S. 144 (1992)................................................................47, 48

*NRDC v. Pena*,
147 F.3d 1012 (D.C. Cir. 1998)................................................23, 24

*O'Donnell Constr. Co. v. District of Columbia*,
963 F.2d 420 (D.C. Cir. 1992).....................................................53

*Old Dominion Dairy Prods. v. Sec'y of Defense*,
631 F.2d 953 (D.C. Cir. 1980).....................................................29

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*,
52 F.3d 1373 (6th Cir. 1995) .......................................................49

*Plyler v. Doe*,
457 U.S. 202 (1982).....................................................................35

*Port City Props. v. Union Pac. R.R. Co.*,
  518 F.3d 1186 (10th Cir. 2008) ........................................................21

\*Printz v. United States,
  521 U.S. 898 (1997)...........................................................................48

\*Procter & Gamble Co. v. Kraft Foods Global, Inc.,
  549 F.3d 842 (Fed. Cir. 2008) ..........................................................22

\*Quill Corp. v. North Dakota,
  504 U.S. 298 (1992)...............................................................39, 40, 41, 43

\*Red Earth LLC, et al. v. Holder, et al.,
  2010 WL 3061103 (W.D.N.Y. July 30, 2010) .....................6, 27, 38, 48, 49, 52

\*Romer v. Evans,
  517 U.S. 620 (1996)........................................................................31, 32, 33

*Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York*,
  749 F. 2d 124 (2d Cir. 1984) ............................................................49

*Shrink Missouri Government PAC v. Adams*,
  151 F.3d 763 (8th Cir. 1998) ............................................................21

*Toyo Tire Holdings of Ams. Inc. v. Continental Tire N. Am., Inc.*,
  609 F.3d 975 (9th Cir. 2010) .......................................................17, 22

*Trifax Corp. v. District of Columbia*,
  314 F.3d 641 (D.C. Cir. 2003)...........................................................28

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*,
  559 F.2d 841 (D.C. Cir. 1977).....................................................49, 50

*Washington Teachers' Union v. Bd. of Educ.*,
  109 F.3d 774 (D.C. Cir. 1997)...........................................................30

*Washington v. Confederated Tribes of Colville Indian Reservation*,
  447 U.S. 134 (1980)...........................................................................40

*Winter v. NRDC, Inc.*,
  129 S. Ct. 365 (2008).........................................................................22

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985)...................................................20, 49

*Wyandotte Nation v. Sebelius*,
    443 F.3d 1247 (10th Cir. 2006) ...............................................22, 23

**STATUTES**

15 U.S.C. § 376..................................................................................45

18 U.S.C. § 1715................................................................................32

18 U.S.C. § 1716..............................................................................7, 32

18 U.S.C. § 1716A..............................................................................31

18 U.S.C. § 1716D..............................................................................31

Jenkins Act, Pub. L. No. 363, 63 Stat. 884 (1949) ..................................53

Prevent All Cigarette Trafficking Act, Pub. L. No. 111-154

    .......................................... 6, 7, 29, 30, 32, 33, 34, 35, 36, 40, 43, 44, 46

Cal. Rev. & T. Code 830101.7 .............................................................45

**OTHER AUTHORITIES**

*Unemployment on Indian Reservations at 50%: The Urgent Need to Create*
    *Jobs in Indian Country: Hearing before the S. Comm. on Indian Affairs*,
    111th Cong. 1-2, 11-12 (2010) (statement of Donald Laverdure, Deputy
    Assistant Secretary of Indian Affairs, Department of the Interior)...................18

156 Cong. Rec. H1534 (daily ed. Mar. 17, 2010) ...........................................32, 37

California Cigarette and Tobacco Products Tax Regulations, Art. 16 ...................45

75 Fed. Reg. 36443 (June 25, 2010).........................................................25

## <u>GLOSSARY</u>

| | |
|---|---|
| PACT Act | The Prevent All Cigarette Trafficking Act of 2009, Pub. L. 111-154 (March 31, 2010). |
| NACSO | National Association of Convenience Store Owners |
| SFTA | Seneca Free Trade Association |
| USPS | United States Postal Service |
| DOJ | Department of Justice |
| ATF | Bureau of Alcohol, Tobacco, Firearms, and Explosives |
| Appx. | Joint Appendix |

## <u>JURISDICTIONAL STATEMENT</u>

The district court had subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, as this case involves questions arising under the United States Constitution.

This Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1292(a)(1), as the district court, on June 29, 2010, denied Mr. Gordon's motion for injunctive relief. On June 30, 2010, Mr. Gordon timely appealed the district court's June 29 Order.

## <u>STATEMENT OF THE ISSUES</u>

1.     Whether the district court applied the correct legal standard when it denied Mr. Gordon's motion for a preliminary injunction.

2.     Whether Mr. Gordon has established his entitlement to a preliminary injunction against the challenged provisions of the PACT Act.

## STATEMENT OF THE CASE

Consumers and American Indians were dealt a serious blow on March 31, 2010, when the President signed into law the misnamed Prevent All Cigarette Trafficking Act, Pub. L. No. 111-154 ("PACT Act").  Enacted at the behest of Big Tobacco and the National Association of Convenience Store Operators ("NACSO"), the PACT Act aims to eliminate small tobacco manufacturers and mail-order tobacco retailers—businesses primarily owned and operated by American Indians.  The Act deals a one-two punch to these small businesses:   it first bans the use of the United States mail to deliver tobacco products, and then, just in case mail-order tobacco retailers manage to find an alternate means of delivery, requires retailers to pay all state and local taxes in the state of delivery *before* making a sale.

The PACT Act is an arbitrary affront to the basic rights of consumers and small businesses to purchase and deliver a lawful product.  It is an affront to the due process clause, which protects nonresidents from taxation in foreign states.  And it is an affront to federalism because it purports to rewrite state taxation laws and to commandeer state officials to enforce these newly rewritten laws.  One federal district court has already held that the Act raises serious constitutional concerns and, as a result, preliminary enjoined its enforcement in part.  This is an

appeal from another district court's order, which incorrectly denied Mr. Gordon's motion to enjoin the unconstitutional sections of the PACT Act.

Mr. Gordon, an enrolled member of the Seneca Indian tribe, owns and operates a store that primarily sells tobacco products, including cigarettes. The PACT Act imposes drastic new requirements on individuals, like Mr. Gordon, who mail tobacco products to their customers. Relevant here, the PACT Act prohibits the United States Postal Service ("USPS") from accepting for shipment most tobacco products, and it requires Mr. Gordon to pay state and local taxes in the jurisdiction of delivery before even making a sale.

On June 28, 2010, Mr. Gordon filed this action, and on August 13, 2010, he timely amended his complaint. In the Amended Complaint, Mr. Gordon alleges that the PACT Act violates (i) his due process rights because the Act irrationally prevents him from engaging in his chosen profession, imposes criminal penalties without adequate notice, and subjects him to the taxing jurisdiction of other states without regard to his contacts with those states; (ii) his equal protection rights because the Act discriminates against delivery sellers and American Indians as a racial group, but does not rationally further any government interest; (iii) the Tenth Amendment's reservation of certain powers to the States because the Act improperly forces the States into the service of the federal government; and (iv) his rights as a member of the sovereign Seneca Nation.

Simultaneous with the filing of this action, and prior to the PACT Act becoming effective, Mr. Gordon moved for a temporary restraining order and a preliminary injunction to prevent enforcement of the PACT Act. Defendants-Appellants did not file a response. The district court denied Mr. Gordon's motion. Mr. Gordon now appeals the district court's order.

## STATEMENT OF FACTS

## I.     PREVENT ALL CIGARETTE TRAFFICKING ACT

The PACT Act primarily impacts "delivery sellers" of cigarettes. A delivery seller is a seller who is "not in the physical presence of the buyer when the request for purchase or order is made." PACT Act § 2(a); Addendum at 3-4.[1] Before the PACT Act, federal law required delivery sellers to provide notice of the sale to the state where the buyer was located, but did not require sellers to pay excise taxes owed by the buyer. This enabled states to collect taxes from resident buyers. Under the PACT Act, however, delivery sellers are now not only responsible for excise taxes owed *by the buyer* under state law, but they must also pay the tax "*in advance of the sale*, delivery, or tender." *Id*. § 2A(d); Addendum at 9 (emphasis added).[2] The Act does not require a minimum number of sales into a jurisdiction before a delivery seller is subject to the tax-prepayment obligation.

The PACT Act also cripples the ability of delivery sellers to actually deliver their products. Section 3 of the Act amends 18 U.S.C. § 1716 so that it now provides:

---

[1] A copy of the PACT Act is attached to Mr. Gordon's Opening Brief as an addendum.

[2] Approximately 550 state or local jurisdictions impose an excise tax on cigarettes. *Red Earth LLC, et al. v. Holder, et al.*, Nos. 10-cv-530A, 10-cv-550A, 2010 WL 3061103, at *11 (W.D.N.Y. July 30, 2010).

6

> All cigarettes and smokeless tobacco . . . are nonmailable and shall not be deposited in or carried through the mails. The United States Postal Service shall not accept for delivery or transmit through the mails any package that it knows or has reasonable cause to believe contains any cigarettes or smokeless tobacco made nonmailable by this paragraph.

PACT Act Sec. 3(a); Addendum at 24.

## II.    FACTUAL BACKGROUND

Plaintiff-Appellant Robert Gordon, an enrolled member of the Seneca Nation, owns and operates a tobacco store on the Allegany Indian Territory in New York. (Appx. 31.) He sells tobacco products to individuals who physically enter his store, and he also accepts orders over the phone, over the Internet, and through the mail. (Appx. 34.)

Mr. Gordon is not the only member of the Seneca Nation who relies on selling tobacco products to make a living. While there are only 8,000 enrolled members of the Seneca Nation, those members own more than 140 tobacco-related businesses, which constitute approximately 30% of mail-order tobacco retailers in the United States. (Appx. 44, 48.) Sales made by Seneca-owned business represent approximately 80% of the mail-order and Internet sales potentially affected by the PACT Act. Declaration of Robert Odawi Porter in Support of the Seneca Nation of Indians' Motion for Leave to File a Brief Amicus Curiae at ¶ 15 ("Porter Decl.") (filed in *Red Earth LLC, et al. v. Holder, et al.*, Nos. 10-cv-530A, 10-cv-550A (W.D.N.Y. July 16, 2010) (Dkt. # 42.1).

7

The Seneca's involvement in the sale or trade of tobacco is hardly a recent phenomenon. The Seneca were one of the most powerful pre-colonial civilizations on the North American continent. (Appx. 43.) Centuries before the 1607 settlement of Jamestown, the Seneca domesticated wild tobacco plants and raised them for trade with other American Indian nations. (Appx. 44.) The arrival of European colonists only expanded the demand for tobacco and encouraged further development of an already substantial cash crop for the Seneca.

The present day reliance of the Seneca on the tobacco industry cannot be overstated. As with most American Indian tribes, the Seneca have faced serious challenges. The Seneca have been forced to live in smaller and smaller territories and have seen their opportunities for economic development dwindle. (Appx. 47.) Even with their robust tobacco trade, the standard of living among Seneca Indians is similar to that of other Indian tribes around the country—poor. Based on 2000 census data, the average Seneca Indian earned only $12,300 per year. (Appx. 46-47.) Nationally, the per capita income of Indians is roughly *half* of the U.S. average. Some American Indian territories have unemployment as high as 80%. *See Unemployment on Indian Reservations at 50%: The Urgent Need to Create Jobs in Indian Country: Hearing before the S. Comm. on Indian Affairs*, 111th Cong. 1-2, 11-12 (2010) (statement of Donald Laverdure, Deputy Assistant Secretary of Indian Affairs, Department of the Interior). Revenue generated from

the sale of tobacco is not only essential to the private sector, but it is also a critical source of revenue for the Seneca Nation's government, which taxes each carton of cigarettes sold from its territories.  (Appx. 44-45.)  The Seneca government depends on this revenue to provide health, education, and welfare programs for the Seneca people.  (*Id*.)

Consumers also benefit from the Seneca's manufacture and sale of tobacco products.  Cigarettes produced and sold by the Seneca give consumers a lower priced alternative to the premium brands sold by the major tobacco companies.  As a result of the Seneca's entrepreneurial spirit, customers have the option of not buying cigarettes from convenience stores, which allows for additional savings and convenience.

Further, as sellers of tobacco products, the Seneca have always taken seriously their responsibility to prevent underage smoking and illegal trafficking.  Indeed, the Seneca Nation requires that *any* business selling tobacco products on Seneca Territory have a license and that these businesses verify the age of their customers.   (Appx. 45-46.)  In addition, the Seneca Nation has frequently cooperated with federal and state agencies, including the USPS, the New York State Department of Taxation of Finance, and the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), in their efforts to combat illegal trafficking of cigarettes.  (Appx. 46.)  The efforts of the Seneca Nation have not gone unnoticed,

as noted in a May 12, 2009 letter to the Seneca Nation from Ronald B. Turk, ATF

New York Field Division Special Agent in Charge:

> On behalf of [the ATF], please accept my gratitude for the assistance and support recently provided by the Seneca Nation of Indians to help curtail illegal cigarette trafficking.
>
> As a result of the Seneca Nation's cooperative efforts with ATF, several investigations into illicit cigarette trafficking have been initiated and are now being prosecuted.  The assistance provided thus far has been invaluable, and we recognize the efforts made by the Seneca Nation to curtail illegal cigarette distribution.

Brief for the Seneca Nation of Indians as Amicus Curiae in Support of Plaintiffs'

Motion for a Preliminary Injunction at 3, *Red Earth LLC, et al. v. Holder, et al.*,

Nos. 10-cv-530A, 10-cv-550A (W.D.N.Y. July 16, 2010) (Dkt. # 42) ("Seneca

Nation Amicus Brief").  In fact, the ATF has informed the Seneca Nation that "the

Nation's law enforcement activities and cooperation with the ATF *have largely*

*eliminated the Nation's Territories as a source of contraband cigarette*

*trafficking*."  Porter Decl. ¶ 12 (emphasis added).

Now, however, it will be impossible for Mr. Gordon and nearly all other

Seneca tobacco retailers to continue to operate.   Approximately 95% of Mr.

Gordon's sales are shipped to his customers through the U.S. mail.  (Appx. 34.)

Without the USPS, Mr. Gordon has no other shipping alternatives.  (Appx. 35.)

That is because, in 2005 and 2006, then-Attorney General Eliot Spitzer strong-

armed the major commercial carriers—FedEx, UPS, and DHL—to stop accepting

tobacco products for shipment from New York businesses, including Seneca businesses. (Appx. 35; Appx. 47-48.) Since that time, Mr. Gordon has relied exclusively on the USPS to ship his products to his customers. (Appx. 35.) After passage of the PACT Act, the SFTA investigated other shipping options for its members, but it identified no feasible alternatives. Therefore, the mailing ban has eliminated 95% of Mr. Gordon's revenue.

Even if Mr. Gordon had another shipping option, he still faces the incredible burden of having to continually monitor and comply with the tax laws of 550 jurisdictions around the country. (Appx. 124.) After passage of the PACT Act, Mr. Gordon began that monumental effort: his attorneys contacted numerous state agencies to determine how Mr. Gordon could prepay their tobacco excise taxes; yet, as of June 28, none provided any meaningful guidance. (Appx. 31.) It thus became clear to Mr. Gordon that he could no longer expect to profitably run his business while having to comply with the tax laws of 550 state and local jurisdictions, especially since the PACT Act applies even if he makes only a single sale to a single customer in a given jurisdiction.

As a direct result of the PACT Act, Mr. Gordon has been forced to wind down his business. (Appx. 36.) He has stopped taking orders from new customers, and he has informed his 22 employees that they all would soon be terminated. (*Id.*) He also had to refund money to existing customers whose orders

11

he could not fill by June 29. (*Id.*) Even though Mr. Gordon cannot continue operating his business, he must still continue paying on long-term contracts that he entered into before the PACT Act, which further exacerbates his injury. (Appx. 36-37.)

Although Mr. Gordon hopes to resume operations if the PACT Act is found unconstitutional, the longer he is out of business, the harder it will be for him to start again. He predicts that his former customers will soon find other sources for tobacco products, and that he may never be able to rebuild what was a significant customer base. (Appx. 36-37.) In addition, he may be unable to replace certain of his employees, who possess specialized skills. (*Id.*)

Mr. Gordon is not alone. The SFTA estimates that no less than 140 tobacco retailers within the Seneca Territories rely on the USPS to deliver their products, and that without the U.S. mail those retailers will be forced to terminate nearly 2,200 employees. (Appx. 49-50.) Seneca wholesalers, distributors, and stamping agents will also suffer. (Appx. 50-51.) By conservative estimates, the overall loss of jobs on the Seneca Territory will number more than 3,000—approximately 13% of all Seneca members will lose their jobs. (Appx. 52.)

## III.   PROCEDURAL HISTORY

On June 28, 2010, Mr. Gordon initiated this action and also filed an application for a temporary restraining order and a motion for a preliminary

injunction.   (Appx. 1, 56.)   On August 13, 2010, Mr. Gordon amended his complaint.  (Appx. 77.)  In his Amended Complaint, Mr. Gordon asserts that the PACT Act violates his due process rights; his equal protection rights; the Tenth Amendment's reservation of certain powers to the States; and his rights as a member of the sovereign Seneca Nation.   On June 29, 2010, the district court denied Mr. Gordon's motion primarily because it was filed the day before the law was to go into effect, and also because the court was not convinced that the public interest would be served by enjoining "a legislative enactment of the Congress of the United States."   Order at 1-2, *Gordon v. Holder, et al.*, No. 10-cv-01092 (D.D.C. June 29, 2010) (the "June 29 Order") (Dkt # 6) (Appx. 54.)  Mr. Gordon timely appealed.

## SUMMARY OF ARGUMENT

The district court's order denying Mr. Gordon's motion for a preliminary injunction should be vacated for two separate and independent reasons.

1. The district court abused its discretion when it applied the incorrect legal standard to Mr. Gordon's motion. The court completely failed to consider the two most important factors when faced with a request for a preliminary injunction—likelihood of success on the merits and irreparable injury—and only mentioned in passing one of the other two factors. Rather than apply the well-established four factor test, the district court instead focused on Mr. Gordon's alleged "delay" in filing his motion. "Delay" *before* a law goes into effect cannot support the denial of injunctive relief because it is irrelevant to any of the four factors a district court must consider. And, even if this species of delay were relevant, it could not *alone* justify denial of injunctive relief without considering the required factors. In any event, given the circumstances, Mr. Gordon filed his motion as soon as reasonably possible, and no party was prejudiced by any delay.

2. Mr. Gordon has established his right to a preliminary injunction. A district court weighs four factors on a sliding scale when deciding whether to award preliminary injunctive relief: likelihood of success on the merits, irreparable injury, the public interest, and whether a party will be substantially injured by the injunction. Here, each factor supports the award of injunctive relief.

14

a.     Mr. Gordon has demonstrated a likelihood of success on the merits with regard to at least three of his claims:  that the PACT Act violates his due process and equal protection rights because it prohibits him from using the U.S. mail to ship his products for no rational reason; that the PACT Act violates his due process rights because it potentially forces him to pay taxes to thousands of jurisdictions without regard to whether he has "minimum contacts" with those jurisdictions; and that the PACT Act exceeds Congress's enumerated powers and unconstitutionally commandeers the States.

b.     Mr. Gordon has plainly demonstrated irreparable injury.  It cannot be reasonably disputed that the PACT Act will make it impossible for him to continue his business.  That is not surprising, considering that the PACT Act was intended to put tobacco retailers like Mr. Gordon out of business.  In addition, Mr. Gordon alleges that his constitutional rights have been violated.  It is well established that a violation of an individual's constitutional rights, even for a brief period of time, constitutes an irreparable injury.   Therefore, if Mr. Gordon can establish a likelihood of success with regard to any of his constitutional claims, then he will have necessarily satisfied the irreparable injury prong of the test.

c.     No party would be substantially injured if enforcement of the PACT Act is temporarily delayed.  An injunction would simply restore the law to what it has been for the last several years.  The Department of Justice ("DOJ"), the ATF,

15

and the USPS would in essence simply continue to do what they have been doing for the last several years. That is hardly a substantial injury. The government may argue that state and local governments would be injured by not being able to collect applicable taxes. However, a brief delay in being able to collect taxes is not a substantial injury. If the Act is found to be constitutional, then state and local governments will still have every right to collect taxes that should have been paid.

       d.    The public interest supports enjoining enforcement of the PACT Act. Mr. Gordon seeks to prevent the enforcement of an unconstitutional law, and the public always has a strong interest in seeing that unconstitutional laws are not enforced. In addition, the public has an interest in ensuring that the economy of the Seneca is not destroyed unconstitutionally. Finally, to the extent Appellees assert that immediate enforcement of the Act would benefit public health, that assertion must be rejected. As explained by the court in *Red Earth*, he PACT Act does not seek to make it harder to buy cigarettes or reduce the use of cigarettes in any way—it simply regulates how cigarettes are bought and sold.

## STANDARD OF REVIEW

This Court "reviews a district court's weighing of the four preliminary injunction factors and its ultimate decision to issue or deny such relief for abuse of discretion." *Davis v. Pension Benefit Guaranty Corp.*, 571 F.3d 1288, 1291 (D.C. Cir. 2009). A district court, however, "abuses its discretion when it applies the incorrect legal standard, [or] misapplies the correct legal standard." *Colvin v. Caruso*, 605 F.3d 282, 299 (6th Cir. 2010); *accord Toyo Tire Holdings of Americas Inc. v. Continental Tire North America, Inc.*, 609 F.3d 975, 979 (9th Cir. 2010); *Citizens for Police Accountability Political Committee v. Browning*, 572 F.3d 1213, 1216 (11th Cir. 2009). Likewise, "[l]egal conclusions—including whether the movant has established irreparable harm—are review *de novo*." *Davis*, 571 F.3d at 1291.

# **ARGUMENT**

Despite Congress's assertions to the contrary, the PACT Act has nothing to do with fighting terrorism or preventing teen smoking. At bottom, the PACT Act is about transferring an incredible amount of wealth from a historically disadvantaged minority group to a select few, namely Altria (formerly known as Phillip Morris), Reynolds American, Lorillard (collectively, "Big Tobacco"), and the members of the National Association of Convenience Store Owners ("NASCO"). For nearly a decade, those groups have lobbied Congress to enact legislation that would effectively cripple one of their few serious competitors—the Seneca.[3] For a variety of reasons, the Seneca have been able to survive in the tobacco industry despite the massive growth and consolidation of their corporate competitors. However, the Seneca's centuries-old tobacco commerce now stands on the brink of extinction, as it will be impossible for most delivery sellers to survive under the PACT Act's tax requirements and its mailing ban. That result is

---

[3] In fact, in 2003 Philip Morris (now Altria) almost succeeded in banning Internet tobacco sales when Representative Roy Blunt, a long time beneficiary of Philip Morris campaign contributions, secretly slipped a provision restricting Internet tobacco sales into the Homeland Security bill. *See* Jim VandeHei, *GOP Whip Quietly Tried to Aid Big Donor; Provision was Meant to Help Philip Morris,* Wash. Post*,* June 11, 2003 at A1. A representative from Altria (the parent company of Philip Morris) admitted that the provision had been "pretty important" to Altria. *Id.* This importance was not based in altruism. In 2002 Philip Morris saw a 13% fall in profits because the rising cost of cigarettes had resulted in smokers finding better bargains from websites, discount brands, and counterfeit cigarettes. Patricia Sellers, *Altria's Perfect Storm*, Fortune, Apr. 28, 2003, at 96.

not particularly surprising given that the unstated goal of the Act was to eliminate delivery sellers for the benefit of Big Tobacco and NACSO.

Before the PACT Act accomplishes its unstated (but only real) goal, Mr. Gordon seeks a reasoned and thorough review of the Act's constitutionality. Such a review is particularly critical given the unprecedented changes to the law effected by the PACT Act: it completely prohibits the mailing of a perfectly legal product that poses no risk to mail carriers, and it subjects delivery sellers to out-of-state taxes without regard to the sellers' contacts with the taxing jurisdiction and without regard for the laws of the taxing states themselves. Further, time truly is of the essence. The PACT Act has forced Mr. Gordon to shut down his business temporarily, and the longer Mr. Gordon is unable to operate his business, the less likely it is that he will ever be able to resume operations. Mr. Gordon is not alone. Thousands of fellow Seneca also face irreparable injury as a result of the PACT Act. In contrast, no individual or entity faces serious harm if enforcement of the PACT Act is delayed for a brief period until its constitutionality can be determined. For those reasons, and as discussed in greater detail below, the district court erred when it denied Mr. Gordon's motion for a preliminary injunction.

Accordingly, Mr. Gordon requests that this Court (i) vacate the June 29 Order, and (ii) remand this case to the district court with instructions to enjoin enforcement of the challenged sections of the PACT Act. In the alternative, Mr.

Gordon requests that this Court vacate the June 29 Order and remand this case to the district court so that the district court can apply the correct legal standard.

## I.    THE DISTRICT COURT ABUSED ITS DISCRETION BY APPLYING THE INCORRECT LEGAL STANDARD

When considering whether to grant a preliminary injunction, "the district court *must examine* whether (1) there is a substantial likelihood plaintiff will succeed on the merits; (2) [the] plaintiff will be irreparably injured if an injunction is not granted; (3) an injunction will substantially injure the other party; and (4) the public interest will be furthered by the injunction." *Ellipso, Inc. v. Mann*, 480 F.3d 1153, 1157 (D.C. Cir. 2007) (emphasis added).[4]   Those four factors "have typically been evaluated on a 'sliding scale.'"  *Davis*, 571 F.3d at 1291.   "If the movant makes an unusually strong showing on one of the factors, then it does not necessarily have to make as strong a showing on another factor."  *Id*. at 1291-92. "For example, if the movant makes a very strong showing of irreparable harm and there is no substantial harm to the non-movant, then a correspondingly lower standard can be applied for likelihood of success."  *Id*. at 1292.

---

[4]   This Court has often used mandatory language when referring to the balancing test.  *See, e.g.*, *Davis*, 571 F.3d at 1291 ("the district court *must* balance four factors") (emphasis added); *Mills v. District of Columbia*, 571 F.3d 1304, 1308 (D.C. Cir. 2009) ("court *must* balance the strength of a plaintiff's arguments in each of the four elements") (emphasis added); *Al-Fayed v. CIA*, 254 F.3d 300, 303 (D.C. Cir. 2001) ("a court *must* weigh four factors") (emphasis added).

Although all four criteria may influence the analysis, the two criteria often cited as having greater importance are likelihood of success on the merits and irreparable injury.  It is unclear whether this Court views one factor as "more" important than the other, but it is clear that each should receive significant weight. *Compare Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985) ("The basis for injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies.") *with Davis*, 571 F.3d at 1296 (Kavanaugh, J., concurring) ("a strong showing of irreparable harm, for example, cannot make up for a failure to demonstrate a likelihood of success on the merits"); *Katz v. Georgetown Univ., et al.*, 246 F.3d 685, 688 (D.C. Cir. 2001) ("although we apply a four-factor test in weighing a request for a preliminary injunction, such relief never will be granted unless a claimant can demonstrate a fair ground for litigation") (internal quotations omitted).[5]

---

[5] District courts in this Circuit also appear to be split on which factor is most important. *Compare Apotex, Inc. v. Sebelius*, No.10-517, 2010 WL 1254563, at *3 (D.D.C. Apr. 2, 2010) ("The likelihood of success requirement is the most important of these factors.") *aff'd* No. 10-5094, 2010 WL 2767090 (D.C. Cir. July 6, 2010) *with* 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered") (quoted approvingly in *Appalachian Voices v. Chu*, No. 08-0380, 2010 WL 2902767, at *3 (D.D.C. July 26, 2010).
   The other circuits are split on the question.  *Compare Jones v. Caruso*, 569 F.3d 258, 277 (6th Cir. 2009) ("the 'likelihood of success' prong is the most important to our analysis"); *Shrink Missouri Government PAC v. Adams*, 151 F.3d

Here, the district court abused its discretion when it failed to apply the correct legal standard in denying Mr. Gordon's request for injunctive relief. The district court did not even mention the two most important factors. As it stands, Mr. Gordon may very well have established a likelihood of success on the merits *and* an irreparable injury, but was still denied injunctive relief. Although it may be theoretically possible for the substantial injury and public interest factors to outweigh the likelihood of success and irreparable injury factors, the district court's analysis in this case certainly would not support such a result. The district court summarily concluded, in a *single sentence*, that "the Court is not convinced that the public interest would be served by ordering this extraordinary form of relief, which would stop in its tracks a legislative enactment of the Congress of the United States." (Appx. 55.)[6] Because the district court failed to apply the well-established four factor balancing test, this Court should reverse the June 29 Order.

---

763, 764 (8th Cir. 1998) ("The most important of the *Dataphase* factors is the appellants' likelihood of success on the merits.") *with Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009) ("irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief"); *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1190 (10th Cir. 2008) ("a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction").

[6] The Supreme Court recently criticized a district court for only spending a single sentence on the public interest factor. *See Winter v. NRDC, Inc.*, 129 S. Ct. 365, 378 (2008).

On very similar facts, the Federal Circuit reversed a district court order denying injunctive relief. There, as here, the district court only considered the public interest factor and "expressly refused to consider the [other] three factors." *Procter & Gamble Co. v. Kraft Foods Global, Inc.*, 549 F.3d 842, 847 (Fed. Cir. 2008). That failure constituted reversible error. *Id.*; *see also Toyo Tire*, 609 F.3d at 982 (reversing denial of motion for preliminary injunction where court did not make any specific findings with respect to factors); *Wyandotte Nation v. Sebelius*, 443 F.3d 1247, 1255 (10th Cir. 2006) (holding that application of wrong standard to motion for preliminary injunction was legal error).

Rather than apply the four-factor test, the district court stated that "[p]aramount to [its] consideration is the lateness of the hour in which plaintiff seeks this relief." (Appx. 54.) The district court's reliance on Mr. Gordon's purported delay in filing is misguided, and in citing *Fund for Animals v. Frizzell*, 530 F.2d 982, 986 (D.C. Cir. 1975), and *NRDC v. Pena*, 147 F.3d 1012, 1026 (D.C. Cir. 1998), the court appears to have misinterpreted this Court's case law. Neither case stands for the proposition that a movant's failure to pursue injunctive relief *before* the irreparable injury was to occur, which Mr. Gordon did here.

In *Frizzell*, although this Court did note that "[o]ur conclusion that an injunction should not issue is bolstered by the delay of the appellants in seeking one," that was only *after* the Court concluded that the plaintiff had failed to

23

establish irreparable injury and a likelihood of success on the merits. 530 F.2d at 986-87. Also, there, the plaintiff was arguing that the length of time that he was given to comment on proposed regulations. The plaintiff, however, did not assert his challenge until a month *after* the comment period closed, which is why his delay was of particular note and why the delay "bolstered" the finding that there was no irreparable injury. *Id.*

In *Pena*, while this Court acknowledged that a plaintiff's delay in seeking injunctive relief could weigh against the award of such relief, the Court also indicated that delay would only weigh against injunctive relief where the delay was (i) unreasonable and (ii) prejudiced the other party. 147 F.3d at 1026. Not only did the district court in the case at bar not apply that test, but it could not have denied relief on that basis: Mr. Gordon did not unreasonably delay in bringing this action, and to the extent there was any delay, the government was not prejudiced by it.

Here, the district court's conclusion that Mr. Gordon "delayed" in filing his motion seems to be based purely on when the motion was filed. But the timing of the motion alone says nothing about whether any delay was unreasonable. Prior to bringing this lawsuit, Mr. Gordon was actively investigating how to comply with the myriad of tax regulations that he must now comply with in advance of making a sale, but his inquiries have fallen on deaf ears. It thus appears that the States are

as uncertain as to the PACT Act's impact on their tax laws. To punish Mr. Gordon for the States' failure to respond to the changes in law effected by the PACT Act would be fundamentally unfair.

With regard to the mailing ban, Mr. Gordon could not simply switch to UPS or FedEx for his shipping needs. As discussed *infra*, *none* of the major shipping companies will deliver tobacco products. Only after it became clear to Mr. Gordon that it would be virtually impossible for him to comply with the PACT Act and operate his business did he decide to pursue legal action. Without making this investigation, Mr. Gordon could not in good faith allege that he would be irreparably harmed by the PACT Act.

Likewise, on June 8, 2010, Seneca Nation representatives met with ATF and DOJ officials to discuss the devastating impact the Act would have on Seneca businesses. Seneca Nation Amicus Brief at 8. The government officials were surprised to learn of the Seneca's concerns and the significant legal problems posed by the Act. *Id*. They promised to consider accommodations for Seneca-licensed retailers. *Id*.

The regulatory implementation of the Act, however, is still not complete. The *comment period* on the DOJ's proposed interim rule did not even close until June 18, 2010. *Id*. And the ATF's notice of proposed rulemaking was not issued until June 25, 2010. 75 Fed. Reg. 36443. Given the government's promise to

consider accommodations for the Seneca, it was hardly unreasonable for Mr. Gordon to file his request for preliminary injunction within days after the implementing agencies took initial steps toward promulgating regulations under the Act.

Mr. Gordon is not a large corporation with an unlimited legal budget; he is the sole proprietor of a store that sells tobacco products. Mr. Gordon brought this lawsuit only after concluding that complying with the PACT Act's requirements would be impossible. Given the circumstances, it can hardly be said that 89 days was an unreasonable amount of time for Mr. Gordon to (i) assess the impact of the PACT Act on his business; (ii) investigate how to comply with the taxing schemes of more than 550 jurisdictions; (iii) investigate whether he could identify a nationwide shipping agent other than UPS, FedEx, or DHL; and (iv) retain counsel to prepare a challenge to an unprecedented legislative act, which implicates significant constitutional issues. Even if some delay could be considered unreasonable, the district court failed to identify *any* prejudice to *anyone* as a result, which further undercuts the court's reliance on delay as essentially the sole reason to deny the motion.

Indeed, in *Red Earth*, one plaintiff filed its motion on June 25, 2010, and another plaintiff filed its motion on July 1, 2010 (two days *after* the PACT Act was to go into effect). *Red Earth*, Nos. 10-cv-530A (Dkt. # 3); 10-cv-550A (Dkt. # 3)

26

(W.D.N.Y.). The governmental defendants, relying on the June 29 Order, argued that the plaintiffs' motions for injunctive relief should be denied due to delay. Mem. in Opp. to Plaintiffs' Mot. for a Preliminary Injunction, Nos. 10-cv-530A, 10-cv-550A (W.D.N.Y. July 1, 2010) (Dkt. # 25). The district court in *Red Earth* nonetheless enjoined enforcement of the PACT Act in part, thus implicitly rejecting the defendants' "delay" argument.

## II.    THE DISTRICT COURT ABUSED ITS DISCRETION IN DENYING THE MOTION FOR PRELIMINARY INJUNCTION

If the district court had applied the correct legal standard, it would have found that Mr. Gordon is entitled to injunctive relief.

### A.    Mr. Gordon Has Demonstrated A Substantial Likelihood Of Success On The Merits

There is a substantial likelihood that Mr. Gordon will prevail on at least three of his constitutional claims—any one of which is sufficient to satisfy the likelihood-of-success prong. First, the mailing ban violates Mr. Gordon's due process and equal protection rights by arbitrarily and irrationally banning the mailing of tobacco products. Second, as the court held in *Red Earth*, there is a substantial likelihood that the tax prepayment requirement violates the Due Process Clause by requiring nonresident retailers to pay state and local taxes without regard to whether they have minimum contacts with the forum. 2010 WL 3061103, at *10. Third, the tax-related sections unconstitutionally commandeer state tax

officials to alter their own taxation laws and implement a federally-imposed taxation scheme for collecting prepaid excise taxes on remote sellers.

      *1.    The PACT Act's Mailing Ban Violates the Protections of the Fifth Amendment*

"[T]he right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment." *Greene v. McElroy*, 360 U.S. 474, 492 (1959). This Court has repeatedly acknowledged such a liberty interest. *See Trifax Corp. v. District of Columbia*, 314 F.3d 641, 643 (D.C. Cir. 2003); *Kartseva v. Dep't of State*, 37 F.3d 1524, 1529 (D.C. Cir. 1994) (recognizing a "constitutionally protected 'right to follow a chosen trade or profession'"). Protected liberty interests are implicated where the government's action "has the broad effect of largely precluding [the plaintiff] from pursing her chosen career." *Kartseva*, 37 F.3d at 1528. This Court has also explained that an individual has "property interests in his salary" and that government interference with that right triggers the Due Process Clause. *Feinberg v. Federal Deposit Ins. Corp,*, 522 F.2d 1335, 1340 (D.C. Cir. 1975) (citing *Manges v. Camp*, 474 F.2d 97, 100 n.3 (5th Cir. 1974)).

The PACT Act "largely preclud[es]" Mr. Gordon from following his chosen profession, *id*., and plainly implicates his property interest in his salary from the business. Specifically, the mailing ban has "effectively put [him] out of business,"

*Old Dominion Dairy Prods. v. Sec'y of Defense*, 631 F.2d 953, 963 (D.C. Cir. 1980), because he can no longer ship his legal products. Given his remote location and the boycott of tobacco products by the major common carriers, the PACT Act's mailing ban means that 95% of Mr. Gordon's business disappeared overnight. (Appx. 36.) The resulting deprivation of Mr. Gordon's liberty interest here triggers the protections of the Due Process Clause, and therefore, the mailing ban is subject to rational basis review. *See Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 712 (D.C. Cir. 2007) (applying rational basis test to due process claim where no fundamental right was implicated).

The mailing ban also implicates Mr. Gordon's equal protection rights under the Fifth Amendment. The PACT Act classifies individuals or businesses based on whether they sell their products in a face-to-face transaction or as "delivery sellers," *i.e.*, sellers who sell their goods over the Internet, over the telephone, or in any other non-face-to-face transaction. *See* PACT Act § 2(a); Addendum at 3-4. The mailing ban is, on its face, aimed at such sellers. Statutes based on this type of classification are subject to rational basis review to ensure that the classification does not violate the Equal Protection Clause. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). Thus, the due process and equal protection components of Mr. Gordon's claim are judged under parallel standards.

29

To satisfy rational basis review, a legislative act must bear some rational relation to a legitimate government purpose. *Washington Teachers' Union v. Bd. of Educ.*, 109 F.3d 774, 781 (D.C. Cir. 1997) (substantive due process "prevents . . . action that is legally irrational [in that] it is not sufficiently keyed to any legitimate state interests."). Congress claimed to have six specific purposes in enacting the legislation:

> (1) require Internet and other remote sellers of cigarettes and smokeless tobacco to comply with the same laws that apply to law-abiding tobacco retailers;
>
> (2) create strong disincentives to illegal smuggling of tobacco products;
>
> (3) provide government enforcement officials with more effective enforcement tools to combat tobacco smuggling;
>
> (4) make it more difficult for cigarette and smokeless tobacco traffickers to engage in and profit from their illegal activities;
>
> (5) increase collections of Federal, State, and local excise taxes on cigarettes and smokeless tobacco; and
>
> (6) prevent and reduce youth access to inexpensive cigarettes and smokeless tobacco through illegal Internet or contraband sales.

PACT Act § 1(c)(1)-(6); Addendum at 2.

The postal ban fails the rational basis test because it is not "rationally" related to any of these stated purposes. As an initial matter, only the fourth and

sixth stated purposes have anything to do with the mailing ban.[7]  The question, then, is whether the mailing ban is rationally related to the purposes of (i) making it more difficult to "engage in and profit from illegal" sales of tobacco and (ii) preventing and reducing youth access to these products.  The answer is "no."

The mailing ban is a novel and sweeping provision.  "The absence of precedent for [the legislation] is itself instructive; '[d]iscriminations of an unusual character especially suggest careful consideration to determine whether they are obnoxious to the constitutional provision.'" *Romer v. Evans*, 517 U.S. 620, 633 (1996) (quoting *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37-38 (1928)).  The PACT Act creates an unprecedented ban on all mailing of a legal, non-dangerous product.  Although Congress has banned the mailing of illegal items, *see Champion v. Ames*, 188 U.S. 321, 357 (1903) (upholding ban on shipment of lottery tickets because "Congress only supplemented the action of those states—perhaps all of them—which . . . prohibit . . . lotteries"),[8] and has likewise prohibited the mailing of products that are hazardous to mail carriers or might damage other mail, *see, e.g.*, 18 U.S.C. § 1715 (banning mailing of

---

[7] The first and fifth purposes are aimed at the new taxing requirements.  The second and third purposes support the increased investigatory tools and enhanced penalties in the statute.

[8]  *See also* 18 U.S.C. § 1716A (banning mailing of lock picking devices and vehicle master keys); 18 U.S.C. § 1716D (banning mailing of illegally-taken fish and animals).

firearms); 18 U.S.C. § 1716 (banning mailing of "injurious articles," including poisons, certain animals, explosives, and other materials that could damage persons or property in transit), neither the federal government, nor any state, has made the possession or sale of tobacco products illegal.

The ban on mailing these legal products is made even more extraordinary by the fact that Congress was fully aware that no other common carrier could serve as an alternate shipper. *See* PACT Act § 2A(e)(3)(B); Addendum at 13 (recognizing agreements not to ship tobacco products by other common carriers); 156 Cong. Rec. H1534 (daily ed. Mar. 17, 2010) (statement of Rep. Weiner) (stating that there was "only one common carrier that today still delivers tobacco through the mail—the United States Postal Service."). This unprecedented ban flies in the face of the longstanding tradition of a free and open Postal Service. *See Currier v. Henderson*, 190 F. Supp. 2d 1221, 1229-30 (W.D. Wash. 2002) (recognizing that the post office is a "basic and fundamental service" and that there is a fundamental right to receive mail). Given the "unusual nature" of the PACT Act's mailing ban, the Court must give it "careful consideration" to ensure it does not improperly infringe on a constitutional right. *Romer*, 517 U.S. at 633.

Although rational basis is a deferential review, it is "not a toothless one." *Mathews v. Lucas*, 427 U. S. 495, 510 (1976). A statutory classification fails this type of review "when it 'rests on grounds wholly irrelevant to the achievement of

the [government's] objective.'" *Heller v. Doe*, 509 U.S. 312, 324 (1993) (quoting

*Holt Civic Club v. Tuscaloosa*, 439 U.S. 60, 71 (1978)). Thus, a court must "insist

on knowing the relation between the classification adopted and the object to be

obtained." *Romer*, 517 U.S. at 632. Here, the mailing ban is not rationally related

to Congress's stated objectives.

The mailing ban is far too broad to be rationally related to the two applicable

legislative purposes. In fact, "its sheer breadth is so discontinuous with the reasons

offered for it that the amendment seems inexplicable by anything but animus

toward the class it affects; it lacks a rational relationship to legitimate state

interests." *Romer*, 517 U.S. at 632. If Congress wanted to "make it more difficult

for cigarette and smokeless tobacco traffickers to engage in and profit from their

*illegal* activities," PACT Act § 1(c)(4); Addendum at 2 (emphasis added),

Congress could have required compliance with existing laws and enhanced

penalties for violations. Indeed, the Act contains numerous new provisions doing

just that and mandating that delivery sellers comply with various state, federal, and

local laws concerning taxation and sales to minors. *E.g.*, PACT Act § 2A(a)(3);

Addendum at 7. However, the statutory mailing ban as written destroys myriad

*legal* sellers of tobacco products, such as Mr. Gordon, along with the illegal ones.

The ATF itself has indicated that the Seneca—who comprise a plurality of the

United States' delivery sellers—"*have largely eliminated the Nation's Territories*

33

*as a source of contraband cigarette trafficking*." Porter Decl. ¶ 12 (emphasis added). A ban that makes no rational distinction between criminals and law-abiding sellers cannot stand. In sum, the Act's *complete ban* on mailing tobacco products is so over-inclusive and duplicative of other provisions that require legal compliance that it can only be explained by animus to delivery sellers at the behest of "special interests" such as Big Tobacco and NACSO. *See Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–412 (1983) (recognizing that "providing a benefit to special interests" is not a legitimate governmental purpose).

The second relevant purpose—reducing youth access—is likewise ill-served by the mailing ban *and* amply addressed by a separate provision of the PACT Act. Section 2A(b)(4) expressly requires delivery sellers to confirm the ages of their buyers. Addendum at 8. For this reason, in *Red Earth*, the court specifically rejected the government's reliance on the youth-protection purpose as a basis for staying the court's injunction. *Red Earth*, Aug. 12 Order at 6; Appx. 147. Indeed, *the USPS itself* offers an age-verification service that requires an adult signature for delivery—a service that Mr. Gordon consistently uses. (Appx. 35.)[9] If Congress were truly concerned with youths purchasing cigarettes through the mail,

---

[9] Mr. Gordon also uses an electronic payment system that confirms the buyer's age using Social Security or Driver's License number. (Appx. 35.)

both the Act itself and the existing USPS service provide the means to prevent that from happening. A complete ban on mailing does not rationally further any legitimate purpose not already achieved by the Act.

In addition, a recent study by an anti-smoking group revealed that only a "small portion" of underage tobacco sales occur online or through the mail, while most minors purchase cigarettes in-person at retail stores.[10] Courts may consider such "available evidence" to determine whether a law passes rational basis review. *Plyler v. Doe*, 457 U.S. 202, 228 (1982) (holding that ban on public-school attendance by illegal aliens did not advance a resource-preservation rationale because the "available evidence suggests that illegal aliens underutilize public services, while contributing their labor to the local economy and tax money to the state fisc"). As in *Plyler*, the targeted class is at most a "small" part of the problem—a problem already addressed by the Act's verification provision—yet it bears a grossly disproportionate burden in the form of a total ban. In light of this evidence, gratuitously forcing mail-order sellers out of business—instead of merely requiring age verification—while leaving in-person retailers untouched bespeaks illegitimate government motives. *Kelo v. City of New London*, 545 U.S. 469, 491 (2005) ("a court applying rational-basis review under the Equal

---

[10] *See Where do Youth Smokers Get Their Cigarettes?* Tobacco Free Kids Org., http://www.tobaccofreekids.org/research/factsheets/pdf/0073.pdf.

Protection Clause must strike down a government classification that is clearly intended to injure a particular class of private parties, with only incidental or pretextual public justifications.").[11]

In the end, the PACT Act—in particular the mailing ban—is nothing but "simple economic protectionism," which is subject to a "virtually per se rule of invalidity." *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978). Congress's own findings disclose its protectionist animus. Congress labels *all* "Internet and other remote sellers" as criminals, by contrasting them with "law-abiding tobacco retailers"—*i.e.*, those who sell in-person—who are left untouched by the law.[12]  Thus, Congress impermissibly chose to "provid[e] a benefit to special interests," *Energy Reserves Group*, 459 U.S. at 412, namely Big Tobacco and NACSO.  These powerful interest groups made no secret of their support of the PACT Act, and their lobbying efforts are fierce and spectacularly well funded, in sharp contrast to those of the Seneca.[13]  Congress was well aware not only that

---

[11] The Act's lack of any rational relationship to preventing trafficking and youth sales is made even more manifest by the exception to the mailing ban for intrastate shipments in Alaska and Hawaii.  PACT Act § 3(b)(2); Addendum at 24.

[12] Congress "found" that the Act will "require Internet and other remote sellers of cigarettes and smokeless tobacco to comply with the same laws that apply to law-abiding tobacco retailers."  PACT Act § 1(c)(1); Addendum at 2.

[13] In 2009 alone, Big Tobacco spent a combined $19,826,215 on lobbying. Center for Responsive Politics, Lobbying Database, http://www.opensecrets.org/lobby/index.php (search for each company, then select year 2009).  NACSO spent $3,011,000.  *Id.*  In the 2008 election cycle, Political

these powerful interests would be unaffected by the mailing ban, H.R. Rep. No. 111-117, at 23 (2009) ("most companies that ship tobacco products . . . rarely use the Postal Service to distribute their products"), but also that imposing the ban would shut down this industry's main competition—remote sellers such as Mr. Gordon, 156 Cong. Rec. H1534 (daily ed. Mar. 17, 2010) (statement of Rep. Weiner) (noting that the mailing ban would make it "very, very difficult, if not impossible, for Internet tobacco sales to continue.").

The Supreme Court "ha[s] repeatedly recognized that protecting a discrete interest group from economic competition is not a legitimate governmental purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002) (collecting cases and invalidating under rational-basis review a state law requiring sellers of caskets attend mortician school). Nor can Congress hide behind "pretextual" legislative purposes in an effort to serve these special interests. *Kelo*, 545 U.S. at 491 (2005). The mailing ban impermissibly does both.

The mailing ban is not rationally related to any of Congress's stated purposes. It deprives Americans of their rights to purchase a lawful product through the mail and arbitrarily forces out of business a class of small-business

---

Action Committees for Big Tobacco made $2,893,804 in total campaign contributions to members of Congress. Center for Responsive Politics, Political Action Committees, http://www.opensecrets.org/pacs/index.php (search for each company, then select 2008 cycle). NACSO made $1,003,378, which included donations to PACT Act sponsors Rep. Anthony Weiner (D-NY) and Sen. Kirsten Gillibrand (D-NY). *Id.*

owners who satisfied that demand. The real purpose of the mailing ban was not to prevent illegal trafficking or protect children but rather to reward the lobbying efforts of the tobacco industry. "This measure to privilege certain businessmen over others at the expense of consumers is not animated by a legitimate governmental purpose and cannot survive even rational basis review." *Craigmiles*, 312 F.3d at 229.

> 2.    *The PACT Act violates due process by subjecting nonresidents to the taxing jurisdiction of state and local governments without regard to minimum contacts*

As the *Red Earth* court held, the PACT Act likely violates nonresident tobacco retailers' due process rights by subjecting them to taxes in state and local forums without regard to whether the retailers have minimum contacts with the taxing jurisdiction. *Red Earth*, 2010 WL 3061103, at *10.[14] The statute is apparently unique in its wholesale attempt to subject nonresident sellers to taxes in

---

[14] Mr. Gordon did not allege that the PACT Act's tax requirements violated his due process rights in his original complaint (nor was this issue raised in his motion for a preliminary injunction), but his amended complaint does assert that claim. Although this Court does not usually consider issues raised for the first time on appeal, Mr. Gordon requests consideration of his due process argument for several reasons. First, the district court did not consider the merits of *any* of Mr. Gordon's claims; therefore, to consider it now would not implicate this Court's interest in having the district court consider all arguments in the first instance. Second, the government will not be prejudiced in any way by consideration of the issue. Third, not considering the issue would lead to judicial inefficiency. If his due process claim is not considered now, then Mr. Gordon will likely have to again seek injunctive relief in the district court based on this claim, and if injunctive relief is denied, another appeal involving the same facts may follow.

any state in which they make a single sale. *Id*. at *9. On pain of felony imprisonment, the PACT Act purports to impose the taxes of at least 550 state and local taxing jurisdictions on delivery sellers who mail tobacco products to customers outside of their own states.

A state's power to tax nonresident sellers, however, is constrained by the Due Process Clause. *Quill Corp. v. North Dakota*, 504 U.S. 298, 305-06 (1992). "The restraining power of the due process clause on the taxing power of the States . . . keeps the taxing power of the States at home." Trost and Hartman, Federal Limitations on State and Local Taxation, § 2:3 (2d ed.).

A state tax imposed on a non-resident seller violates due process unless the seller has "minimum contacts with the [taxing] jurisdiction." *Quill*, 504 U.S. at 307. In *Quill*, the Court applied what amounts to a three-part minimum contacts test: (i) the remote seller must "purposefully direct[] its activities" at the state; (ii) "the magnitude of those contacts" must be such as to permit imposition of the tax, *and* (iii) the tax must be "related to the benefits [the remote seller receives] from access to the State." 504 U.S. at 308.

Applying this test, the Court held that a North Dakota tax on a mail-order seller did not violate due process because the seller was "engaged in continuous and widespread solicitation of business" within that state. *Id.* at 308. The seller mailed some *24 tons* of mail order catalogs into the State that necessarily had to be

39

disposed of by the State.  *Id.* at 302.  And while Quill had no physical presence in the State, it was the sixth largest vendor of office supplies in the State and had approximately 3,000 customers.  *Id.*  The Court found that Quill had purposefully directed its activities at North Dakota residents, creating contacts of sufficient magnitude for due process purposes.  *Id.*  Without such minimum contacts, however, the Court held that a state cannot require an out-of-state corporation to collect taxes on shipments made into the state from another state.  *See Quill*, 504 U.S. at 306; *Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 182 (1980) (Rehnquist, J., concurring in part) ("in order to collect the tax from the merchant located beyond the territorial jurisdiction of the taxing State, there must also be a relationship between the State and the burdened merchant sufficient to satisfy principles of due process").

The PACT Act violates the Due Process Clause by subjecting Mr. Gordon and other retailers to the taxing power of potentially thousands of state and local governments without regard to whether they have sufficient minimum contacts with those taxing jurisdictions.  *See* PACT Act § 2A(d); Addendum 9-10 (requiring retailers to pay state and local excise taxes in advance of sale).  If the PACT Act is permitted to take effect, remote sellers will be required to pay taxes anywhere they ship their products even if they otherwise lack minimum contacts with that taxing

40

jurisdiction. *See id.* Indeed, failure to do so will subject the sellers to up to three years of imprisonment. *Id.* § 3(a); Addendum 19.

The PACT Act thus facially conflicts with *Quill*. It does not limit sellers' obligation to pay state or local taxes to jurisdictions where they actively solicit business or where they have made thousands of sales. *See Quill*, 504 U.S. at 308. Nor does it limit sellers' tax burden to states in which sellers have somehow made use of state services or otherwise availed themselves of state benefits. *See id.* The Supreme Court reaffirmed just two years ago that "[t]he broad inquiry" under the Due Process Clause "is whether the taxing power exerted by the state bears fiscal relation to protection, opportunities and benefits given by the state—that is, whether the state has given anything for which it can ask return." *MeadWestvaco Corp. ex rel. Mead Corp. v. Ill. Dept. of Revenue*, 553 U.S. 16, 24-25 (2008) (quotations and citations omitted). The PACT Act does not even attempt to accommodate these due process requirements. It instead requires that a remote seller pay tax in a distant state on every sale regardless of its contacts with that state.

Obviously, a single sale does not constitute the type of minimum contacts envisioned by *Quill* and *MeadWestvaco*. If a single sale into a foreign jurisdiction were sufficient to meet minimum contacts, the Supreme Court in *Quill* could simply have rested its due process discussion on that ground; there would have

41

been no need to extensively analyze the nature and "magnitude" of Quill's contacts with North Dakota. Likewise in *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), a case cited favorably in *Quill*, the Court squarely held that merely contracting with a resident of the forum state is not sufficient for jurisdiction. *Id.* at 473. Rather, a nonresident must "purposefully direct" his activities toward forum residents by engaging in "significant activities" within the forum state and creating "continuing obligations" between himself and residents of that state. *Id.* at 476. The PACT Act's attempt to impose a foreign state's taxes on every single delivery sale impermissibly "seeks to legislate the due process requirement out of the equation" and is therefore unconstitutional. *Red Earth*, 2010 WL 3061103, at *10.

The Act is also plainly unconstitutional as applied to Mr. Gordon. Mr. Gordon has no physical presence outside of New York. He does not actively solicit business in any State outside of New York. Nor does he utilize the services or benefits of a foreign state. He does not send catalogs or advertising materials to other states or otherwise reach out to residents of foreign states. (Appx. 92.) Mr. Gordon only sells his products when a buyer reaches out to him to place an order through his website or by telephone. Indeed, in certain states, Mr. Gordon makes few or no sales whatsoever. (*Id.*) Under the Due Process Clause and *Quill*, Mr. Gordon cannot constitutionally be taxed merely because he mails a product to a

single customer in a foreign state.  Indeed, the PACT Act's taxation provisions are directly contrary to *National Bellas Hess, Inc. v. Department of Revenue of Illinois*, 386 U.S. 753 (1967), in which the Court "ruled that a 'seller whose only connection with customers in the State is by common carrier or the United States mail' lacked the requisite minimum contacts with the State." *Quill*, 504 U.S. at 301 (quoting *Bellas Hess*, 386 U.S. at 758).  The *Quill* court pointedly declined to overrule this holding of *Bellas Hess. Id.* at 302.  The still-binding holding of the Supreme Court in *Bellas Hess* dooms the PACT Act's taxation provisions.

In sum, the taxation provisions of the PACT Act cannot be reconciled with the protections of the Due Process Clause, which safeguard nonresidents from taxation by distant States where they neither have a physical presence nor actively solicit business.  Congress "does not . . . have the power to authorize violations of the Due Process Clause" for retailers like Mr. Gordon.  *Quill*, 504 U.S. at 305.  Thus, Mr. Gordon has a substantial likelihood of success on his due process claim.

3. *The PACT Act unconstitutionally commandeers states to implement a federal taxation scheme*

Finally, the PACT Act exceeds Congress's enumerated powers because it commandeers states to implement a federal taxation scheme not in accord with existing state law.  Specifically, the PACT Act unlawfully commandeers states to collect excise taxes from a remote seller before a product can be shipped to an adult consumer.  Such an action is beyond Congress's enumerated powers and

43

directly harms Mr. Gordon by subjecting him to state taxes that he would not have to pay absent Congress's unauthorized action.

Section 2A(d) of the PACT Act provides that no delivery seller may "sell" or "tender [cigarettes] to any common carrier," unless "in advance of the sale, delivery, or tender . . . any cigarette . . . excise tax that is imposed by" the State or locality of delivery "has been paid" to the State or locality.   PACT Act § 2A(d)(1)(A)-(B); Addendum at 9-10.   In other words, a delivery seller cannot make a delivery sale unless it prepays "any" excise taxes "imposed by" the state. *Id.*

This is a remarkable—and unconstitutional—provision for one simple reason: It commandeers states to implement a state taxation scheme that is different than the ones many states currently have in place.   California, for example, provides that the purchaser of any item subject to a use tax must pay the tax if it has not otherwise been paid.   California Cigarette and Tobacco Products Tax Regulations, Art. 16.   California law thus expressly allows an out-of-state tobacco seller to *either* pay the excise tax himself *or* inform his customer that the tax has not been paid and therefore must be paid by the consumer.   Cal. Rev. & T. Code §30101.7.   Yet, the PACT Act would require delivery sellers into California to prepay the excise tax, notwithstanding state law.

Indeed, Congress recognized in the PACT Act that some states choose to enforce their excise taxes not by requiring prepayment, but by allowing sellers to collect and remit the tax after the sale. Specifically, the Act exempts smokeless tobacco sellers from prepaying state excise taxes if the seller complies with a delivery state's requirement that "delivery sellers collect the excise tax from the consumer and remit the excise tax to the State." PACT Act § 2A. Yet, Congress arbitrarily chose not to apply this rule to cigarette sellers. Congress's explicit recognition that some states do *not* require pre-payment of excise taxes shows that it willfully chose to rewrite state taxation law by imposing on cigarette sellers alone the onerous duty of paying "any" excise taxes "imposed by" the state *before* a sale is even made. And it shows that Congress intentionally has commandeered state taxation officials into enforcing a taxation scheme different from the one enacted by the people of the state.

The contours of a state's taxation system are integral to state sovereignty. "[I]t is upon taxation that the several States chiefly rely to obtain the means to carry on their respective governments, and it is of the utmost importance to all of them that the modes adopted to enforce the taxes levied should be interfered with as little as possible." *Levin v. Commerce Energy, Inc.*, 130 S. Ct. 2323, 2330 (2010). A state's choices about whom to tax and when those taxes should be paid are based on both policy and administrative preferences. A state may, for example,

45

wish to increase the willingness of mail-order sellers to sell to its citizens at cheaper prices and may therefore choose not to impose onerous excise taxes on out-of-state sellers, allowing sellers the flexibility to pass on those costs to buyers. Or a state may choose not to undertake the burden of collecting taxes from remote sellers before sales are even made, choosing instead to allow delivery sellers to bear the burden of collecting taxes from purchasers and then remitting them to the state. The PACT Act, however, purports to nullify the various tax policies of the states and instead forces all states to alter their own taxation systems to collect excise taxes from delivery sellers before sales are made. It mandates, moreover, that state governments create a means to provide out-of-state delivery sellers with "required stamps or other indicia that the excise tax has been paid." PACT Act § 2A(d)(1)(C); Addendum at 10. The PACT Act upsets the "complex" procedures for "mass assessment and collection of state taxes," which are necessarily organized in accordance with "state procedures." *Levin*, 130 S. Ct. at 2330 n.2. It therefore violates the longstanding "policy of federal noninterference with state tax collection." *Id.*

To be sure, Congress has constitutional authority to impose a *federal* tax. But Congress has not done that here. It has instead dictated that sellers must pre-pay *state* excise taxes, even if various states choose not to require prepayment or choose not to impose the tax on the seller at all. As a result of this requirement,

46

states will be required to alter their own taxation laws and implement mechanisms to collect prepaid excise taxes from out-of-state sellers. This Congress may not do, for Congress must not "commandeer state governments into the service of federal regulatory purposes." *New York v. United States*, 505 U.S. 144, 175 (1992); *accord Printz v. United States*, 521 U.S. 898, 926-30 (1997) (holding that federal government may not commandeer state officials to enforce background-check provisions of the Brady Act). Indeed, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *New York*, 505 U.S. at 162; *Printz*, 521 U.S. at 912 ("state legislatures are not subject to federal direction"). Nor can commandeering of state officials be justified by the Commerce Clause, which Congress purported to invoke in support of the PACT Act. The Commerce Clause "authorizes Congress to regulate interstate commerce directly; it does not authorize Congress to regulate state governments' regulation of interstate commerce." *New York*, 505 U.S. at 166. The power to regulate commerce does not include the power to commandeer state officials and rewrite state taxation law. Congress therefore cannot use state taxation officials as federal "puppets" to regulate the interstate tobacco trade by requiring them to implement new procedures to collect prepaid excise taxes from out-of-state sellers.[15]    *Printz*, 521 U.S. at 928. This interference with, and

---

[15]    The novelty of this commandeering scheme is reinforced by the states' utter

commandeering of, the internal workings of state taxation regimes exceeds Congress's enumerated powers and violates the reserved powers of the states under the Tenth Amendment.[16]

## B.    Enforcement Of The PACT Act Would Irreparably Harm Mr. Gordon

Mr. Gordon has clearly established irreparable injury—he has alleged the loss of his business and a deprivation of his constitutional rights—and therefore, that factor should weigh strongly in support of injunctive relief. *See Red Earth*, 2010 WL 3061103, at *3 (addressing challenge to PACT Act and holding that "plaintiffs have easily satisfied their burden of showing a threat of irreparable injury if injunctive relief is not granted")

Mr. Gordon has demonstrated that enforcement of the PACT Act will destroy his business. It is well established that an irreparable injury may exist "where the loss threatens the very existence of the movant's business." *Wisconsin Gas*, 758 F.2d at 674.[17] As discussed *infra* at 11, 95% of Mr. Gordon's sales are to

---

failure to implement any mechanisms for complying with the Act's mandate to collect prepaid excise taxes from out-of-state sellers. (Appx. 31.)

[16] Because the PACT Act commandeers state officials to alter their own taxation laws and mechanisms, it is markedly distinct from the Jenkins Act, which was upheld because it enabled states to more effectively enforce their existing tax laws. *Consumer Mail Order Ass'n of Am. v. McGrath*, 94 F. Supp. 705, 710 (D.D.C. 1950), *aff'd*, 340 U.S. 925 (1951).

[17] *See, e.g.*, *Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977) (irreparable injury found where harm was

out-of-state customers, and prior to enactment of the PACT Act, Mr. Gordon's *only* option for shipping his products to his out-of-state customers was the U.S. mail. Now, Mr. Gordon has *no shipping options*, and for that reason alone, he will lose 95% of his business. It is difficult to imagine a situation where such a significant loss of customers would not "threaten[] the very existence of the movant's business." The loss of Mr. Gordon's business is not uncertain or theoretical—it is happening right now.

Similarly, Mr. Gordon faces the incredible burden of having to continuously monitor and comply with at least 550 state and local taxing schemes, regardless of how many sales he makes into a given jurisdiction. *See Red Earth*, 2010 WL 3061103, at *11. Mr. Gordon has already attempted to ascertain how he could prepay taxes in remote jurisdictions, but as discussed *infra* at 24, the states apparently have not created any way to collect such taxes. It is therefore more than apparent that the tax requirements imposed by the PACT Act will prevent him from continuing his business.

---

destruction of business in current form); *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1382 (6th Cir. 1995) ("The impending loss or financial ruin of Performance's business constitutes irreparable injury."); *Roso-Lino Beverage Distribs., Inc. v. Coca-Cola Bottling Co. of New York*, 749 F. 2d 124, 125-26 (2d Cir. 1984) ("The loss of Roso-Lino's distributorship, an ongoing business representing many years of effort and the livelihood of its husband and wife owners, constitutes irreparable harm.").

Mr. Gordon also has established irreparable injury because he alleges a violation of his constitutional rights. "It has long been established that the loss of constitutional freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Mills*, 571 F.3d at 1312; *accord Davis*, 158 F.3d at 1342 ("Although a plaintiff seeking equitable relief must show a threat of substantial and immediate irreparable injury, a prospective violation of a constitutional right constitutes irreparable injury for these purposes.") (internal citation omitted); 11A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2948.1, at 161 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). Thus, once Mr. Gordon has shown a substantial likelihood of success on his constitutional claims (which he has already), he does not need to show further injury to meet the "irreparable injury" factor.

### C.     Enjoining Enforcement Of The PACT Act Would Not Substantially Injure Other Parties

A preliminary injunction would not substantially injure other parties. The defendants in this case are the DOJ, the ATF, and the USPS. The only impact that an injunction would have on the DOJ and the ATF is that they would not have to *start* enforcing the PACT Act. In other words, the DOJ and the ATF would essentially operate as they have been operating for the last several years, which is no injury at all, let alone a substantial one. As for the USPS, again, because Mr.

Gordon is simply seeking to preserve the status quo as it existed when he filed his motion, the USPS will not experience any substantial injury. To the extent the USPS has changed its procedures since the PACT Act went into effect, it should not present a significant burden to them to revert back to how they operated on June 29, 2010.

Moreover, a preliminary injunction would not undermine the purported goals of the PACT Act. The *Red Earth* court's denial of the defendants request for a stay pending appeal is instructive. Although there, the court was considering whether the defendants would suffer irreparable harm, not a substantial injury, the court's reasoning is applicable here. First, the court rejected the claim that the taxing jurisdictions would be injured—"[i]f it is later determined that plaintiffs are required to comply with the state and local taxes of a particular jurisdiction, plaintiffs will need to pay the taxes owed at that point." (Appx. 142, 146.) Next, the court rejected the claim that a stay was necessary to prevent smoking, to prevent the sale of cigarettes to minors, and to prevent the illegal trafficking of cigarettes. The court explained that "the PACT Act does not seek to prevent smoking, it merely seeks to regulate remote cigarette sales," "nothing about this Court's injunction makes it lawful to sell cigarettes to minors," and "defendants have simply failed to show a significant threat of illicit cigarette trafficking during

the short time that the expedited appeal to the Second Circuit will be pending."
(*Id*. at 147.)

Therefore, the substantial injury factor supports the award of preliminary injunctive relief.

### D.    The Public Interest Supports Enjoining Enforcement Of The PACT Act

The public interest factor also weighs in support of injunctive relief for two main reasons.

First, a preliminary injunction would serve the public's interest in avoiding enforcement of unconstitutional laws.  *See O'Donnell Constr. Co. v. District of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992); *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002).  That interest is especially important here, where "Congressional expansion of state and local taxing schemes—as mandated under the PACT Act—is unprecedented."  *Red Earth*, 2010 WL 3061103, at *18 (holding that "the public interest favors staying enforcement of a sweeping and unprecedented congressional mandate pending opportunity by this Court and others to fully consider the positions of all parties outside of the hurried context of a preliminary injunction motion").

Second, the public interest favors an injunction because of the "severe economic consequence[s] likely to befall [] members of the Western New York community."  *Id*. at *17.  As the *Red Earth* court explained, most remote tobacco

52

retailers are likely to shut down their businesses, rather than risk criminal prosecution, *id.*, and that is exactly what Mr. Gordon has done.  And as discussed *infra* at 8-9, the Seneca Nation and its members depend greatly on the income generated by the tobacco trade; the effects of completely losing that income are likely to be devastating.  Given the catastrophic damage that the PACT Act will inflict (and has already inflicted) on the Seneca people, it would be anomalous, to say the least, if the "public interest" were now relied on to essentially prevent Mr. Gordon from challenging the constitutionality of an act of Congress that will indisputably drive thousands of Seneca further into poverty.

## <u>CONCLUSION</u>

For the foregoing reasons, this Court should (i) reverse the district court's order denying Mr. Gordon's motion for a preliminary injunction, and (ii) remand the case back to the district court with instructions to grant Mr. Gordon's motion for a preliminary injunction.  In the alternative, the Court should remand this case to the district court so that the district court can applied the correct legal standard.

Respectfully submitted,

*/s/  R. Stan Mortenson*
R. Stan Mortenson
  *Counsel of Record*
Sara E. Kropf
Richard P. Sobiecki
Vernon A.A. Cassin III
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 639-7700

Aaron M. Streett
BAKER BOTTS L.L.P.
One Shell Plaza
910 Louisiana Street
Houston, TX 77002-4995
 (713) 229-1855

Dated:  Aug. 20, 2010                     *Counsel for Plaintiff-Appellant*
                                          *Robert Gordon*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.  This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 13,358 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2003 in 14-point Times New Roman Font.

<u>*/s/ R. Stan Mortenson*</u>
R. Stan Mortenson
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave., N.W.
Washington, D.C.  20004
(202) 639-7700

*Counsel for Plaintiff-Appellant*

Dated:  Aug. 20th, 2010

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Aug. 20, 2010, I filed and served the foregoing Appellant's Opening Brief, in addition to the Joint Appendix and Statutory Addendum, by electronic service through the CM/ECF system to the following counsel, who are registered CM/ECF users:

Michael P. Abate
U.S. Department of Justice
202-514-5000
michael.abate@usdoj.gov

Alisa B. Klein
U.S. Department of Justice
202-514-5000
alisa.klein@usdoj.gov

Mark B. Stern
U.S. Department of Justice
202-514-5000
mark.stern@usdoj.gov

R. Craig Lawrence
U.S. Attorney's Office
202-514-7159
craig.lawrence@usdoj.gov

In addition, pursuant to D.C. Circuit Rule 31(b) and this Court's Administrative Order Regarding Electronic Case Filing, I will cause to be mailed to the Court eight paper copies of this brief within two business days of this filing.

*/s/ R. Stan Mortenson*
R. Stan Mortenson
BAKER BOTTS L.L.P.
1299 Pennsylvania Ave. N.W.
Washington, D.C. 20004
(202) 639-1130
rstanmortenson@bakerbotts.com

Counsel for Plaintiff-Appellant